(16 Misc. Rep. 405.)

### In re CLARK'S ESTATE.

(Surrogate's Court, Washington County. March, 1896.)

1. EXECUTORS AND ADMINISTRATORS—LIABILITY FOR INTEREST.

An executor, on entering on his duties, opened two bank accounts, one bearing interest, and the other an open account, at no time exceeding $500, against which he drew from time to time to pay testator's debts and expenses of administration. The other account drew interest until the bank notified him that it would no longer pay interest on deposits. Within three months thereafter, and as soon as the law permitted, he filed his accounts, and petitioned for a final settlement and distribution. *Held*, that he was not liable for interest on the fund pending the final settlement, though it was shown that another bank at the same time was paying interest on monthly balances, where it did not appear that either the contestants or the executor knew of the rule at the time, or that any of the parties interested required him to deposit the fund in any other bank.

2. WILLS—BEQUEST AT MATURITY—ACCRUED INTEREST.

A bequest of "all mortgages [including notes and other obligations therein described, for which the mortgages are security]" includes interest accrued on the mortgages up to the time of testator's death.

3. PRESUMPTION OF PAYMENT—REBUTTAL.

The presumption, if any, that a note of decedent had been paid by the transfer by decedent to the payee of certain certificates of deposit, is rebutted by the fact that testator, in his will, made after the transfer of the certificates, expressly directed payment of the note.

4. GIFT INTER VIVOS—WHAT CONSTITUTES.

A bill of sale given by a decedent without consideration, and not filed in the town clerk's office, purporting to transfer property of which decedent was the absolute owner, and the use and possession of which was reserved during his life, does not operate as a gift inter vivos, where there is no proof that the bill of sale was ever delivered, except that it was produced on the trial of the person named therein, or that she knew of its existence, or of decedent's intention to give her the property, until the subject came up at the trial, and decedent was in absolute and undisputed possession of the property until his death.

Judicial settlement of the accounts of Charles R. Paris and another as executors of the will of Erskine G. Clark, deceased.

James C. Rogers, for contestants.

Dennis J. Sullivan, for executor, C. R. Paris.

Stephen Brown and A. D. Wait, for executrix, Mary A. Richardson.

Chas. R. Paris, in pro. per.

DAVIS, S.    Erskine G. Clark, the decedent, died at Sandy Hill, N. Y., May 27, 1894, aged about 85 years; leaving a last will and testament, executed June 5, 1893, disposing of somewhat more than one-half of his estate, which consisted entirely of personal property.    The will was duly admitted to probate.    The executor and executrix took the oath of office, and entered upon the discharge of the duties of their trust.    Appraisers were appointed, an inventory made and filed, showing personal property, in bonds and mortgages, notes and money, amounting to more than $81,-000, which increased, up to the date of the petition for judicial settlement, to more than $86,000.    The executrix took little or no part in administering the affairs of the estate, the executor taking almost if not the entire burden and responsibility of the trust.    On the return of the citation for judicial settlement, the executor and executrix having filed separate accounts of their proceedings, certain of the next of kin and legatees filed objections to both accounts.    Separate trials were ordered, and the objections to the two accounts will be considered separately.

The objections to the executor's account will be considered and disposed of first.    Said objections, which were in writing and unverified, alleged that the said account was erroneous, and specified a large number of items, seeking to have the accounts surcharged with large sums of money.    The evidence given on the trial, in our opinion, answers all the objections, or explains satisfactorily all the items that are objected to, and only two or three of the objections need be seriously considered here.

It was sought to charge the executor with interest upon certain funds of the estate pending the final settlement.    As the estate was large, the item of interest was quite important.    It appears that upon the issuing of letters testamentary to the executor, and entering upon his duties, and taking charge of the estate funds, he immediately opened two bank accounts, the one an interest-bearing account, the other an open account, which at no time exceeded $500, which he drew against from time to time to pay debts of the testator and the ordinary and necessary expenses of administration; the other account continuing to draw interest until the bank, about April 20, 1895, notified him that it would no longer pay interest on the deposit.    Less than three months from this time, and as soon as the law would permit him, he filed his accounts, and petitioned for a final judicial settlement and distribution.    Not apprehending any contest or delay, he deemed it important to have the fund ready for distribution any moment that the court might so direct, and has at all times during this weary contest been ready

and anxious to make distribution. The proof that another bank in the same town was paying interest on monthly balances I do not think changes the situation. There is no proof that either the contestants or the executor at the time knew the rule of the other bank, nor that any of the parties interested requested the executor to deposit the funds in the other bank. There is no doubt but that the rule as to the liability of an executor or trustee to pay interest on the trust funds in his hands is, in substance, correctly stated by the counsel for the contestants in his able and elaborate brief. All the cases cited by him have been carefully examined, and there is an evident difficulty, running all through the cases, in ascertaining or establishing any fixed and arbitrary rule which can be applied in all cases. Each case must depend upon, and be governed by, the peculiar facts and circumstances surrounding it. The cases cited by the contestants differ so widely and materially, in their facts and circumstances, from the case in hand, that they do not afford very much aid in disposing of the question here presented. The two cases that seem to be principally relied upon by the contestants' counsel to sustain his contention are In re McKay, 5 Misc. Rep. 124, 25 N. Y. Supp. 725, and In re Babcock's Estate (Surr.) 9 N. Y. Supp. 554,—both Cattaraugus county surrogate court cases. The McKay Case held "that the executors were justified in holding the funds of the estate without investment for a period of six months after their appointment, but should be charged with interest at 4 per cent., after the six months, to date of filing their account." See headnote, page 124, 5 Misc. Rep., and page 725, 25 N. Y. Supp. In the present case the fund of the estate was immediately invested, and drew interest until about three months before the filing of the account and petition for final settlement. In the Babcock Case the executor, who was a stockholder and president of the bank, held the funds of the estate in his bank for more than a year and a half before even filing a petition for final settlement. See page 554, 9 N. Y. Supp. I think that, if the two cases just cited are to be regarded as authority, the executor, Mr. Paris, ought not to be charged with interest, but that he did all that could reasonably be required of him. The proof does not show that Mr. Paris mixed the estate funds with his own, nor used any portion of it in his own business, nor so managed the affairs of the estate as to reap any undue individual benefit from, or by reason of, his appointment as such executor, nor that, under the circumstances, was he negligent in not investing the funds of the estate. The rule to be deduced from the several authorities cited by the contestants, as applied to the facts in this case, I do not think requires me to hold Mr. Paris chargeable with interest on the funds. Jacot v. Emmett, 11 Paige, 142, is a leading case on the subject, and decides that "the mere neglect of an executor or administrator to invest money belonging to the estate, which he may be called upon to pay to the legatees or distributees at any moment, is no ground for charging him with interest where such money is kept ready, in bank or otherwise, to be paid over when called for." I do not find that the rule established in the case just cited has

in any instance been departed from, but has been adhered to and applied whenever the facts and circumstances would permit.

The next question considered is, was the executor justified, when distributing the Kansas mortgages to the several legatees named in the will, in also distributing the interest accrued thereon up to the time of the decedent's death? That is to say, did such accrued interest belong to the legatees, or to the estate? Upon examination of the briefs of the respective counsel, and the authorities cited by them, it would seem that they would regard the answer to the question to depend upon whether or not the bequest of the Kansas mortgages was a general, specific, or demonstrative legacy. I do not so view it. The language of the will, after naming the legatees, is as follows: "All the mortgages [including the notes and all other obligations therein described, and for which the mortgages are security]." The real question is, what was the intent of the testator in the language employed? When that intent is ascertained, the question is decided. It is now elementary law, too well settled to require the citation of authorities, that, when there is an ambiguity, uncertainty, or misdescription in the language of a will, deed, or policy of insurance, or other instrument of kindred character, parol evidence of the surrounding circumstances is admissible to ascertain the meaning and intent. What did the testator mean? What was in his mind? And what did he intend to bequeath when he caused the following language to be made a part of his will: "(including the notes and all other obligations therein described, and for which the mortgages are security)?" The interest coupons, or any other thing about the notes or bonds that indicated interest due and unpaid, were just as much of an obligation, and therefore as much within the meaning of the language employed by the testator, as the note or bond itself to which they were attached and a part of. The mortgages were just as much of a security for the interest as they were for the principal sum named in the notes or bonds. It would seem as if the testator carefully selected his language so as to avoid and provide against the very question that is here raised by the contestants. I think it is too plain for argument, that the testator intended to bequeath the accrued interest with the notes and mortgages. If the views above expressed are correct, it follows that interest accruing subsequent to the testator's death goes with the bonds and mortgages, as a matter of course.

I will now consider some of the objections made to the account of the executrix, Mary A. Richardson. She also presents a claim against the estate of a $10,000 note made by the decedent June 16, 1892, payable in one year, without interest, upon which is indorsed a payment of $5,500, February 14, 1893, by the assignment and transfer to Mrs. Richardson of certain securities to that amount. It is argued with a great deal of ability and earnestness by the contestants' counsel that the law will presume this note to have been paid, and particularly by the transfer of two certificates of deposit in the People's Bank, of Sandy Hill, amounting to $5,500, in April and May, 1893. The proof not showing that

anything was said by the parties at the time as to the reason of the transfer of the certificates, it is urged that the law will presume it was to pay an existing indebtedness, if there was any. In the light of the surrounding circumstances, and the relation of the parties as brought out by the evidence (too numerous to be detailed here), I do not think such presumption arises; and, if it did, it would be entirely overthrown and destroyed by the fact that in the testator's will, executed June 5, 1893, and subsequent to the transfers of the certificates, he expressly directs the payment of this note.

It is further urged by contestants' counsel that, the law presuming the note to have been paid, the re-execution of the will does not revive the debt. It is elementary law, of course, that a re-execution of a will does not revive a legacy or devise that has been adeemed and satisfied, but that is not the situation here. It was not intended by the testator to revive a canceled debt, but to specially direct the payment of an existing one. I think the proof in the case clearly establishes the note as a claim against the estate.

It is further urged by the contestants' counsel that the account of the executrix is erroneous in that she does not charge herself with, nor account for, large sums of money paid during the last few months of the testator's lifetime by parties who owed Dr. Clark, which money must have come into Mrs. Richardson's possession. It appears that, for several months prior to the decedent's death, he was infirm, confined to his house, a good deal of the time to his bed, during which time Mrs. Richardson had sole charge of the household affairs, and also, according to her own testimony, had charge of his money and papers; and during these last few months, considerable sums of money were paid at the house, in various amounts, to Dr. Clark, or Mrs. Richardson, and Mr. Paris, to wit: Payments on the Carlton, Moynhan, and O'Connor mortgages, $230; the Preston Paris check for interest on Kansas mortgages, paid at the house by Cashier Townsend, $596.85; the Swift mortgage, $300; and other sums, amounting to $932.20; aggregating $2,059.05. During his last sickness it was Mrs. Richardson's habit to deposit Dr. Clark's money in the bank for him, when he was unable to go to the bank himself, and she swears that she always took the money and deposited it in the bank as soon as paid; but, so far as I am able to find, neither Dr. Clark's bank book, nor the testimony of the officers of the bank, shows any deposits to have been made during the period covered by the payments of these several sums, except the sum of $665, which was deposited by Charles R. Paris. Mr. Paris also left with Mrs. Richardson $65 to pay household expenses, and a chair for $45 was bought (which chair Mrs. Richardson still claims), leaving a balance of $1,284.05 unaccounted for; for which sum, with interest thereon since May 27, 1894, the date of the testator's death, the executrix should account, and her account be surcharged with the amount, which should be deducted and taken out of the amount due Mrs. Richardson on her note against the estate of the deceased.

It is also claimed by the contestants that Mrs. Richardson acquired no title to the personal property, consisting of household furniture, etc., described in a certain bill of sale executed by Dr. Clark, and that said bill of sale is invalid; that Mrs. Richardson's title cannot be upheld as a gift; and that said personal property should be accounted for by law. I think this claim of the contestants is well founded. What are the conceded or undisputed facts? The bill of sale was given without any consideration whatever. It was not filed in the town clerk's office. It was conceded on the trial, by the executrix's counsel, that it would be void as to creditors; and according to the expressed conditions of the instrument itself, Dr. Clark was to be the sole and absolute owner, and was to have the use and absolute possession and control of the property during his lifetime, the same as if the instrument had not been given. There is no proof that the instrument was ever delivered to Mrs. Richardson, except the doubtful and unsatisfactory inference to be drawn from the fact that it was produced by her upon the trial when called for. It is not proved that Mrs. Richardson knew of the existence of the bill of sale, nor of Dr. Clark's intention to give her the property, until the subject came up during the trial. The language of the instrument is as follows:

"All the furniture and all other chattel property, of whatsoever kind, name, or nature, which is at, on, or belongs upon, the premises where I, said Clark, reside, in Sandy Hill, Washington county, N. Y., including all that shall be at, on, or belonging upon said premises at the time of my decease, which shall belong to and be owned by me at or before my death. * * * Said Clark hereby reserves the use and possession of all said property during his natural lifetime, to all intents and purposes the same as."

Dr. Clark was the absolute and sole owner of the property, in the absolute and undisputed possession of the same, and exercised entire control and dominion over it, until his decease; and Mrs. Richardson did not assume to take possession of, nor to exercise any control over, the property, until after the death of the decedent. With these facts conceded and undisputed, what was conveyed, and what did Dr. Clark part with, by this bill of sale? Nothing. To uphold Mrs. Richardson's title to this property upon these facts would be to disregard all settled and elementary rules of law that have been established and followed by the courts in this state for a long period of time. In Rosenburg v. Rosenburg, 40 Hun, 96, the court holds "that, to constitute a gift inter vivos, it requires a full and unqualified renunciation of the title by the donor, and the acquisition by the donee of an absolute title, accompanied by actual delivery of the subject-matter of the gift. The donor must surrender all his title and interests, without making any conditions by means of which he may resume the possession and enjoy his former estate in the property. This, as a legal proposition, is well settled;" citing many cases. A gift is ineffectual which expressly reserves the use of the property to the donor for a certain period, or as long as the donor should live. 2 Schouler, Pers. Prop. 118. If the gift regards the future, it is but a promise without consider-

ation, and has no validity. Pars. Cont. (5th Ed.) p. 15, § 1. In Curry v. Powers, 70 N. Y. 212, the court of appeals held that "an absolute gift requires a renunciation by the donor, and an acquisition by the donee, of all interest in and title to the subject of the gift." In Young v. Young, 80 N. Y. 422, the court holds, that "to establish a valid gift, a delivery of the subject of the gift to the donee, or to some person for him, so as to divest the possession and title of the donor, must be shown." "Delivery is essential, both at law and in equity, to the validity of a parol gift of a chattel or chose in action, and it is the same whether it be a gift inter vivos or causa mortis. Without actual delivery, the title does not pass. A mere intention or naked promise to give, without some act to pass the property, is not a gift. There exists the locus penitentiæ, so long as the gift is incomplete, and left imperfect in the mode of making it, and a court of equity will not interfere and give effect to a gift left inchoate and imperfect." 2 Kent, Comm. 438. In Jackson v. Railway Co., 88 N. Y. 520, the court decided that "it is essential, to constitute a valid gift, that there should be a delivery such as vests in the donee control or dominion over the property, and absolutely divests the donor, and the delivery must be made with intent to vest the title in the donee." In Re Bolin, 136 N. Y. 177, 32 N. E. 626, it was held that, "to establish a valid gift, the evidence must show a delivery of the property, with intent on the part of the donor to divest himself of the title and the possession, and must be inconsistent with any other intention." Other authorities might be cited, but we deem it unnecessary. To uphold the gift contended for, upon the facts proved in this case, would be in direct conflict and antagonism to all established rules and authority on the subject. The authorities cited in the able and exhaustive brief of the executrix's counsel have all been examined, excepting those of other states, some of which have not been accessible; and, after giving all such authorities their due weight and consideration, they would not sustain a gift, upon the facts proved in this case. It is urged by the counsel for the executrix that the gift should be upheld under the rule that "a gift by deed is valid at common law, though there be no actual delivery of the thing given" (assuming, of course, that the deed is delivered), citing cases from other states. That is, no doubt, good law, under the facts proved in those cases. In the present case the instrument, upon its face, specially provides that the maker of it should remain the owner and retain absolute control of the property as long as he lived. I cannot see how such an instrument conveyed anything, even if it had been delivered. The only cases cited by counsel for the executrix that tend to sustain his contention, where a gift by deed was upheld without a delivery of the property, and where, by the terms of the instrument itself, the donor was to retain some control over and benefit from the subject of the gift, are Gordon v. Wilson, 4 Jones (N. C.) 64, and Adams v. Broughton, 13 Ala. 731. In these cases there was no question as to the delivery of the deed. The subject of the gift in both cases was a number of slaves. The consideration expressed in one deed was "love and affection for a

bastard child." Both of these cases were decided at a time when, and in states where the law regarded certain human beings as chattel property, to be bought and sold or given away. I do not find that these cases have been approved or cited by any of the courts of this state. Both, in the subject of the gifts, and in the doctrine upon which the gifts were upheld, are in direct conflict to the declared and settled law of this state. I cannot sustain the gift in this case upon such authorities. Although they may, in some measure, sustain the contention of the able counsel for the executrix, I feel bound by the decisions of the courts in our own state. The property described in the bill of sale belonged to the estate of the decedent, and should be appraised and accounted for by Mrs. Richardson, and the value, when ascertained, should be deducted from the amount found due to Mrs. Richardson on her note against the estate.

We are also asked by contestants' counsel to require Mrs. Richardson to account for large sums of money, amounting to many thousand dollars in cash and securities, shown to have been in her possession at Dr. Clark's decease. It appears that in the last three of four years preceding Dr. Clark's death, and in a few months succeeding his death, Mrs. Richardson deposited, in her own name, in the various banks in the county and vicinity, sums of money amounting in the aggregate to between fifty and sixty thousand dollars. It is conceded on all hands that all of this money must have come from Dr. Clark, excepting comparatively a very small sum that she had when she went to Dr. Clark's to live, and her testimony is not entirely satisfactory as to how she acquired this small sum. How did she acquire and amass, and come into possession of, all this vast sum of money? Was it done fairly? Was it done honestly? At the first blush, this question is more easily stated than answered. There is proof that she went to Dr. Clark's a poor woman, hired to him as a housekeeper, first at $3 per week, afterward for $500 a year, performed about 20 years' service, and was paid by a note for $10,000. She had sole charge of his household affairs, and, some time before the doctor's death, had charge of his papers and money. There is no proof that the family at any time consisted of more than these two people. On the trial it was shown, and I think to the astonishment of all concerned, if not even to the executrix herself, that at the death of Dr. Clark, or very soon after that, she was in possession of, and claimed to own, property, in value, approaching, if not exceeding, $60,000, nearly all of which came into her possession subsequent to September 1, 1890, and after Dr. Clark had passed his eightieth year, when his memory was somewhat impaired; and on one occasion he fell down on the sidewalk, and $6,000 in currency, that he had been carrying in his hat, was scattered on the ground, he having fallen without any apparent cause, except his general weakness incident to old age; and all this happening while Mrs. Richardson, who was of no kin to Dr. Clark, was working at $500 a year, by contract. This remarkable state of facts, unexplained, was certainly sufficient to excite suspicion, invite inquiry, and provoke serious and thorough

investigation, on the part of the next of kin. On the other hand, it appears that Dr. Clark was a physician and surgeon of ability, always having a large and lucrative practice; an exceedingly skillful and judicious business man, in making investments and saving the increase. This continued for so long a period of time—probably for more than half a century—that he acquired very large wealth, frequently making large and generous gifts of money and land to such persons as he desired, and, at his own expense, causing to be erected, in a public park in the village where he resided, the magnificent monument in memory of the soldiers of the Civil War, costing many thousands of dollars. It is claimed that these large sums of money and other property in Mrs. Richardson's possession were gifts from Dr. Clark to her. It appears that Mrs. Richardson had been his faithful housekeeper for almost a quarter of a century, taking charge of his elegant home, in which he was accustomed to entertain quite largely; and she was, no doubt, his confidential adviser in business matters, as she seems to be possessed of financial skill and ability scarcely less marked than that of her benefactor. It is easy to see how Dr. Clark might well have desired to reward her in a sum far exceeding simple compensation for services. Dr. Clark may have been more liberal in his gifts to Mrs. Richardson than the ordinary person would have been under the same circumstances. He may have selected a different person as a recipient of his magnificent bounties than what the average individual would have done. But that was his business, and not ours. His large wealth was all honestly acquired by himself, and he had a right to do what he would with his own. He well knew that, after making these large gifts to Mrs. Richardson and to others, there would still remain sufficient so that handsome sums could be distributed among his next of kin by his will, or by the law. Upon the whole evidence, I do not think that I would be warranted in arbitrarily requiring Mrs. Richardson to account for this large sum of money, the amount of which, at best, could only be estimated or guessed at. In view of the vast amount of testimony taken in this case; the number and importance of the objections made; the large amount of the estate that is involved in this accounting; the high social standing of all the parties interested; the intricate and close questions of law and fact to be examined; the eminence of the counsel engaged; the ability, vigor, and determination with which this contest was conducted,—it seemed due to the parties and their counsel that we should give the reasons for our judgment in the case. Decreed accordingly.